By the Court, Mitchell, J.
Previous to "November, 1835, Peter, John, Thomas and Collin Mitchell, Richard Camochan, Thomas Yermilyea, B. W. Rogers, John Graham and Benjamin Marshall were interested in lands in Florida, known as Forbes & Co.’s purchase, and amounting to about 1,200,000 acres. Their title had been in dispute, but was confirmed by a decision of the supreme court of the United States. On the 28th of November, 1835, they agreed that each proprietor should vest, by regular deeds, the whole title to the .lands, legal and equitable, in three trustees, and that the affairs of the company should be conducted by six directors, whose powers and duties were regulated by the articles of association. The land thus conveyed was to be represented by scrip to be issued by the trustees to each proprietor in proportion to his interest in the land ; each share to consist of 500 acres, and the whole number of shares to be 2400; saving shares enough to satisfy a mortgage upon the land “ so that the entire title” (to the land) “ unincumbered, in law and equity, shall be fully, absolutely and unconditionally vested in the said trustees, that they may immediately make legal titles to all purchasers, and divide the proceeds among the stockholders.” The land was to be conveyed to Louis McLane, Charles Augustus Davis and Joseph M. White, to hold to them, their successors and the survivor of them in trust for the benefit of the proprietors, and in trust to convey the same in the manner prescribed in the articles. Contracts for the sale of the lands were to be made by the board of directors, and notes and bonds to be taken by them, payable to the trustees; and deeds of conveyance were to be executed by the trustees, or any two of them. The trustees were to hold their *507 offices for three years, at the expiration of which time the trust was to close, unless renewed by a vote of the directors. After the three years, the stockholders or two-thirds of them in interest concurring, might alter or modify the provisions of that agreement in such manner as they might think most conducive to the interest of the concern ; provided that no alteration should be made to change any contract for the hypothecation or pledge of scrip for the payment of any loan to extinguish mortgages or other liabilities authorized by these articles. In pursuance of this agreement, the proprietors) on the same 28th day of November, 1835, by deed of that date referring to the above agreement, and for the purpose of making the land available in the most expeditious manner■, and reciting that it was to be conveyed to the trustees above named on certain trusts specified in the articles, conveyed to the trustees “ parties of the second part, and to their successors, all their right and title in law and .equity” to said lands, “ to hold to the use and benefit of the stockholders” and to the several uses, interests and purposes in the said memorandum of agreement set forth. No words of inheritance, and no express words showing the duration of the trust or of the estate granted, were expressly used. On the 28th of November, 1838, an agreement was signed by the owners of 2233 out of 2400 shares¡ pursuant to the clause contained in the original articles, modifying those articles in several respects, and among others, appointing Lewis Curtis and George Griswold trustees in place of the three trustees, and directing these last to convey to the two new trustees the legal estate in the lands, and declaring that the new trustees should hold their offices for the term of five years from the date of this last instrument, unless among other things, those articles should be altered and new trustees appointed; and also providing that at any time after the first year “ the stockholders, or two-thirds of them in interest concurring,” might appoint new trustees, and alter or modify the provisions of the articles and of this last agreement, in such manner as they might think most conducive to the interest of the concern, but with the proviso contained in the first articles. The number of directors was reduced to *508 five, and it was made their duty to make sales of the lands in such manner,- and to such persons, and. for such prices, and to take such security, as the majority of the directors should think proper. They also had power to appoint a secretary, and such surveyors and other assistants as might be necessary, and in general to do all things necessary and proper to carry the objects of the trust into effect. The trustees were to make conveyances to such persons as the directors should order and direct. On the 29th of November, 1888, by deed reciting, in substance, the articles of agreement, the deed of 28th November, 1835, the instrument of 28th November,-1838, and its direction to the original trustees to convey, the said trustees conveyed to Lewis Curtis and George Griswold, their heirs and assigns, all and singular the said tract of land, and all the estate, &c. of the said three trustees, to hold to the new grantees, their heirs and assigns, as joint tenants and not as tenants in common, in trust for the use and benefit of the stockholders and for the purposes in the original instrument, and in the instrument altering it, set forth.
Subsequently, on the 27th of Nov. 1843, the articles were again amended, by the concurrence of at least two-thirds in value of the share owners. The secretary of the company, the case says, testified that the several amendments were signed by two-thirds of the stockholders in value; he did not know if they were two-thirds in amount. If they were two-thirds in value they must have been two-thirds in interest, and the secretary must have meant, by two-thirds in amount, two-thirds of the number of the stockholders. They were again amended June 26, 1845. The conveyance to Curtis and Griswold must have been known to the shareholders, and also the subsequent one to Curtis and Delafield. These amendments recognize and ratify these conveyances. The amendments of 27th Nov. 1843 refer to the original articles and their amendments, and renew and continue in force the said articles of association for one year from the 28th of Nov. 1843, and appoint Delafield and Curtis trustees ; the former in the place of Griswold, “ who is directed to convey to Delafield and Curtis the legal estate, so *509 far as the same is vested in him.” On the execution of which conveyance, &c. Delafield and Curtis are directed to deliver to Griswold an obligation binding the company to execute all contracts made under, and duties imposed by, the articles of association and by-laws, upon said Griswold as trustee. The new trustees were to continue for one year. The duty of the directors to make sales, and of the trustees to execute deeds, is repeated, but no deed is to be ordered “ until the purchase money be paid,” or the “ residue unpaid be secured by a bond or note, with a mortgage on the premises.” The amendments of Oct. 7,1844, continue the articles as amended, for one year from Nov. 28,1844, and declare that “Delafield and Curtis are hereby continued in office as trustees for the term of one year from the 28th day of Nov. 1844.” The amendments of 26th June, 1845, continued the articles for three years from 28th Nov. 1845, and declare that “Joseph Delafield and Lewis Curtis are hereby continued in office as trustees for the term of three years from the 28th day of Nov.” 1845. The articles were again amended on the 4th of Nov. 1848, and Delafield and Curtis were reappointed and continued trustees for the term of three years from 28th Nov. 1848.
The object of the association was to transfer the legal title to trustees, so that they could sell and give a good title to purchasers, without the intervention of the proprietors, and notwithstanding any change in the ownership of the shares. To effect this, it was necessary that the fee should pass to the trustees. If the original deed failed to give them the fee, for want of words of inheritance, a court of equity would have reformed it in that respect. The parties, in effect, did the same thing. The original trustees having conveyed to the second set of trustees with words of inheritance, two-thirds in interest of the shareholders, under the power in the original articles to alter and modify those articles, directed Griswold to convey the legal estate to Curtis, as trustee in his place, and Griswold accordingly conveyed to Curtis, with words of inheritance. The like two-thirds in interest of the shareholders, who must be assumed to have known the nature of the con *510 vejance to Delafield and Curtis, and that it was in fee, in 1844 and 1848 expressly declared that “ those gentlemen were thereby continued in office as trustees.” This was a recognition of them as lawfully existing trustees, with such estate as was granted to them, and a reappointment of them with the like estate. It was a confirmation of the conveyance to the new trustees, and bound the two-thirds in interest who concurred in it, and by virtue of the powers vested in such two-thirds by the original articles, bound also the other shareholders; especially as it was in conformity with the actual intention of the original articles.
The trustees, therefore, can give a good, legal and equitable title to a purchaser, unless it be affirmatively shown that there was some defect in the original title of the proprietors ; or that any parcel of land is incumbered; or that the trust deed is void.
The cause was tried at special term, and the facts tending to show the objections to the title there proved. The only evidence of a defect in the title of the trustees related to a portion only of the lands ; and showed that the city of Apalachicola brought ejectment, in the spring of 1848, against Day <fc Co., in place of whom Curtis and Griswold, as such trustees, as before mentioned, were admitted to defend, as the landlords; that the premises then in controversy were lands lying at the foot of Florida promenade, bounded on the sides by wharf lots Nos. 6 and 7 ; at the foot of Leslie street, bounded on the sides by wharf lots Nos. 12 and 18; and at the foot of Center, Chestnut, Palmetto, Cypress, Juniper, Fulton, Monroe, Franklin and Jefferson streets ; each lot bounded on the sides by wharf lots of certain numbers; the land at the foot of Palmetto street being bounded on the sides by wharf lots Nos. 28 and 29; and that the city, on a trial upon the merits, recovered those lands, and was put into possession of all except the lands held by the plaintiff. Part of the evidence in the case is given in the record of that trial. Among the evidence was the above deed to the original trustees, and the deed from them to Curtis and Griswold, and a deed from the two last trustees to Notase and *511 Brooks, conveying a lot in Apalachicola by a map on file in the city council, bounding it by Water street, Chestnut street, and other lots on said map; Chestnut street running down to the river. The court must have held that Curtis and Griswold were the landlords by the law of Florida, when it admitted them to defend as such ; and thus included a decision that the trusts under which they held were legal by the laws of Florida, and that they had the legal estate, and not a mere poWer. No evidence of title on the part of the city seems to have been produced. It may therefore be inferred that the court held, 1st. That the trustees on behalf of the association making a map of that part of their lands, laying them out with streets, and selling by such map, thus dedicated the streets to the public ; and 2dly. As the lots claimed in that suit were all at the foot of such street, and bounded by wharf lots on their sides, that the court also held (as is held in favor of this city) that the slips extending at the foot of streets, and in continuation of them, and the wharves erected over such slips, belonged to the city; unless, in the maps laying out the property, or in some other equally notorious way, such slips and wharves were reserved for the original owners. The lands which the company agreed to convey to the plaintiff and Dardin are described in the agreement as in front of Palmetto street, marked F. on the city map, and lying between wharf lots Nos. 28 and 29 of said map. The lands in the ejectment suit are described as at thefoot of Palmetto street, and as bounded on the sides by wharf lots Nos. 28 and 29. The descriptions seem to be nearly the same ; especially if Palmetto street runs to the river, and not along or parallel with it. Yet it was stated, in substance, on the argument, and not denied, that these are different lots. If they are the same, does that decision control as to the lots in question ? It would if that action propezdy brought the title to these lots in issue. But the action was ejectment in its old form, in which Richard Roe, lessee of the city of Apalachicola, was .plaintiff, and John Doe defendant, and the latter gave the ancient friendly notice to J. Day & Go. tenants in possession, to come in and defend. The possession by those tenants, ac *512 cording to that form of action, limited the extent of the recovery; and although lands not occupied by such tenants might be described in the declaration in ejectment, yet as the tenants of these latter lands would have no notice of the action, the judgment could not affect the title to them. Accordingly, the plaintiff’s evidence shows that while possession was given to Hourse and Brooks as agents of the city, by the marshal, of the other lands described in the ejectment suit, it was not given of the lands held by the plaintiff and Dardin, but that they retained and still retain the possession, notwithstanding that recovery. The plaintiff does not, in his complaint, pretend that there has been any recovery against him by the city of Apalachicola, or by any one else, of the lands held by him under the company. The plaintiff’s witness, Porter, states facts which may well account for a decision in his favor if he had been a party to that suit, and against Day & Co., and against the trustees as to certain other streets and lots at the foot of those streets. He says that in 1835, 1836, 1837 and 1838 the trustees made sales of lots in the city of Apalachicola, at auction, and sold by a map, on which streets, plots, squares and wharf property were laid down; that at the first sale, the streets were laid out to the vjater, but at the second sale the foot of each street was blocked off as wharf lots, and that the wharf lot of the plaintiff was one of the lots so blocked off. This blocking off of the plaintiff’s wharf lot was an open and public notice that it was reserved by the trustees for their benefit, and that it was not to be dedicated to the public, and they saved it to the company.
The plaintiff, also, in his complaint, had specified the defects in the company’s title, on which he relied—that the associates of the company could not convey a good title by reason of mortgages and other liens or estates outstanding in said lands. The term “outstanding in the lands,” and the connection of it with the words '■'•mortgages and liens? shows that the defects intended were incumbrances on the land, and not a total want of title. The plaintiff’s objections should be confined to those, unless he clearly made out an actual want of title, and in suph a way as not to surprise the defendants.
*513 The complaint also alleges that Delafield and Curtis cannot convey a good title. But this refers to the supposed invalidity of the conveyance to the trustees. There is no proof that the mortgage referred to in the articles of association covered the property now in suit; and it is not to be inferred without proof.
The next question is as to the validity of the trust deed. As already stated, there is some proof that the deed was held to be valid by the laws of Florida, in the ejectment suit. The broad proposition has been pressed on the court that the law of our own state is. to be deemed the law of other states, unless proof to the contrary be shown; and that this is so, even as to our statutes, and even as to those relating to titles to lands a.nd to trusts. If that were so, the proof in the ejectment suit would change the burthen. But the rule is too broadly stated. The true rule assumes to be founded on a probability that it will lead to the actual truth, and is not a technical rule forced upon courts against their conviction of what is right. Until the contrary is proved, it is more likely to be true than false, that the laws of another state are the same as ours, as to contracts relating to personal estate, and as to commercial matters particularly; and that when the common law is known to prevail it is construed there as it is with us, whether relating to lands or personal property. So also, interest is now considered as much an incident to a loan of money as rent is to the letting of a house or of lands. It is therefore an assumption most compatible with truth, that interest at some rate is allowed in every state. Although the rate of interest, therefore, is fixed by statute, yet as some rate is universal, our courts must allow some rate; and if the parties furnish no better guide to the truth, the court assumes ours to be the legal interest, in computing the amount to be recovered. But when we introduce what we know to be a new law, (as is our statute respecting trusts,) it would be a perversion of reason to pretend to infer that as soon as we placed the new law on our statute book, every other state in the union and' in the world would adopt the same law. Slavery was abolished here in 1826. It would be a bold proposition that we should infer that it was thenceforth abolished in *514 all the other states in which it was proved to have previously existed. Within the present century we. have adopted laws giving priority to conveyances of lands according to the order of time in which they are recorded ; creating liens in favor of mechanics ; at one time making banking a monopoly—afterwards opening it to all, under certain restrictions. Many of the states have by express statute, adopted similar laws. He would be a very unwise man who, inferring that our sister states had conformed their laws to ours, should make his investments accordingly. And it would be no less unwise and unjust in a court, to make the same inference, and on it to determine the rights of parties. Any conclusion which shocks reason and common sense cannot be founded on correct rules of evidence.
The eases quoted are generally consistent with the above principles. In Dollfus v. Frosch, (1 Denio, 374,) it was said that we must presume -that the law of France allows three days of grace on bills of exchange. In Leavenworth v. Brockway, (2 Hill’s Rep. 201,) the same principle was applied, and it was held that it was to be presumed that the law of Ohio, as to the steps necessary to fix an indoiser of a note was the same as the law of this state. (So also Brown v. Gracey, 16 Eng. Com. Law. Rep. 426 ; 2 Dowl. & Ry. 41 in note.) See, however, the note to 2 Hill, 202, which shows that in Illinois (in Mason v. Wash, Breese’s Rep. 16,) inasmuch as a statute of Illinois required things to be done to charge an indorser, more than the common law requires, the court there inferred that the laws of this state conformed to the Illinois statute; and that in South Carolina it was held, in Allen v. Wilson, (2 Hill’s So. Car. Rep. 319, 322,) that the plaintiff could not recover money won at a faro table, as gambling was unlawful by the statutes of South Carolina. And see also Harris v. Allnut, (12 Loui. Rep. 465,) there referred to. The case in South Carolina is analogous to one that had been decided in England, and may be reconciled on the idea that gambling is immoral, and injurious to the community, and that therefore the courts of any state which condemns it, cannot sanction a recovery on such a consideration.
*515 In Hosford v. Nichols, (1 Paige, 226,) the chancellor, holding that it could not be alleged that a mortgage given in Pennsylvania, on lands in New York, pursuant to a contract made in New York, would be void for charging seven per cent interest, said that it did not appear that the laws of Pennsylvania i made void contracts for more than six per cent; and that courts of this state cannot take notice of the laws of other states, unless they are proved in the same manner as other facts; citing 8 John. 189 ; 2 Cranch, 186.
In Thompson v. Ketcham, (8 John. 189,) which was an action on a promissory note made by the defendant, an infant under 21 years of age, in the island of Jamaica, the court refused to take notice of what the law of that island was, as to infancy, and did not assume that it was the same as ours; the court saying that it lay with the defendant to show that his plea of infancy was good by the law of Jamaica, and that the court are not to know that fact without proof; that it is “ the duty of the party who interposes a defense to a contract otherwise binding, to prove every thing requisite to the validity of the defense.”
In Robinson v. Dauchy, (3 Barb. S. C. Rep. 29,) an action claiming to recover goods on account of fraudulent representations of the purchaser, the court said “prima facie the law of Massachusetts, where the fraud was committed, is like our own, and when no proof is given on the subject, our courts will act on their own laws.” So far as relates to the effect of fraud, at common law, this was undoubtedly correct, as we know that the common law prevails in that state.
In Abell v. Douglass, (4 Denio, 305,) the plaintiff sued to recover moneys paid by him to the defendant. One objection to his recovery was that they were paid voluntarily, with a full knowledge of all the facts of the case. The defendant and others had joined in a purchase of lots at Erie, Pennsylvania, with a view to speculation. The title was taken in the name of McCluer, who held it for the benefit of, and under a trust (probably secret and not in writing) for, those who advanced the purchase money. The plaintiff, after this, bought (by verbal *516 agreement) the defendant’s share in the purchase and gave his own notes for the amount, which he afterwards paid. He sued for the money thus paid. It was shown on the trial that the statute of frauds of Pennsylvania made void all sales by parol of any legal estate in lands. Ho statute of that state was proved mating void the sale by parol of equitable interests in lands; and decisions of the courts of Pennsylvania were referred to by our court, (not proved on the trial,) that such sales were valid. If our statutes respecting lands and as to trusts are to be presumed to be the law of other states, then, as only a certain section of the Pennsylvania statute was proved, and it was not proved that their statute of frauds, and as to trusts, had not all the provisions of our statutes, it would have followed that as our statute prevents any trust resulting in favor of the person who has paid the consideration money for land when he has allowed the title to be taken in the name of another, the defendant had no legal or equitable title to the lands. (1 R. S. 728, § 51.) See also, our statute making void generally parol trusts as to lands. (2 R. S. 728, § 51.) And as our statute.relative to trusts allowed only certain express trusts, among which was not included a trust to sell or hold for the benefit of the owners of the land, (1 R. S, 728, § 55,) the trust under which McOluer held, if it were express, would also be deemed void, until it was proved that there was no such statute in Pennsylvania ; just as is contended by the plaintiff in this case. But the court took no such view of the law. They said “ we are to assume that the common law was in force in Pennsylvania ; and as far as appears by the evidence given on the trial, there is nothing in the statute law of that state to prevent a transfer by parol of the defendants’ equitable interest in the land being as effective as a transfer in writing would have been.” Thus they assumed the common law to exist in another state, until the contrary was proved, and did not transfer our statute law to a neighboring state, as part of its law. Taking the decisions of our own state as the guide, this is clearly the rule in our state.
But if our statute law were to prevail, the result would *517 not, be different. The revised statutes have declared that words of inheritance shall not be requisite to convey an estate in fee, and that every grant of real estate shall pass all the estate of the grantor, unless the intent to pass a less estate shall appear by express terms, or be necessarily implied in the terms of the grant. (1 R. S. 748, § 1.) This would give to the first three trustees the fee in the lands. They also declare that when an express trust is created for a purpose not enumerated in the article on trusts, it shall be valid as a power in trust if it authorizes the performance of any act which may be lawfully performed under a power. (1 R. S. 729, § 58.) The article on powers describes a general power as one which authorizes an alienation in fee to any person whatever; (Id. 732, § 77;) and declares a general power to be in trust when any person other than the grantee of the power is designated as entitled to the proceeds or other benefits to result from the alienation of the lands. (Id. 734, § 94.) All the trust deeds refer to the articles of association, and show that the trustees were appointed to sell the lands, and that persons (other than the grantees of the power, who were the trustees,) were designated as entitled to the proceeds, namely, the grantors of the estate and power. The deed was therefore valid as a power in trust. Sections 102,108 and 134 of the article on powers, together with other sections in the same article, and the adoption of sections 66 to 71 inclusive, of the article on trusts, show that a power in trust is not (like a mere power of attorney to convey lands) revoked by the death of the grantor of the power, or a sale of his interest; but that the power still continues until it is revoked pursuant to an authority contained in the instrument creating the power. The present trustees could, therefore, under our laws, give a good title by virtue of the power in trust granted to them.
There is another answer to the plaintiff’s objection to the title of the trustees. He made his written contract to purchase from the company in Oct. 1841, and whether he took possession before or after that time, he has held under the company ever since, and show's no other title under which he pretends to hold. The *518 evidence shows that no one claims adversely to the company ^ny pa.rt of the wharf lots, except that the city claims and has recovered as by dedication from the trustees, those wharf lots, which on the maps were laid out as open to the public. The plaintiff, with, a knowledge of the sales made by the trustees, under which this dedication was inferred, contracted to buy those lots of the company, in 1841; he at that time being also an owner of 11 out of 2400 shares of which the whole property consisted. He remained in possession under the trustees, as was shown by his paying the first three installments which by his contract he was to pay, viz: $800 in May, 1842, $800 in May, 1843, and $750 in October, 1843. He still continues in possession, and it must be under them, since he does not show any other proprietor under whom he holds. The rent he has received has been (at one time at least) $3000 per annum. Under these circumstances he cannot refuse to pay the consideration agreed on for his purchase, unless he offers to rescind the contract and deliver up the property. This he has never done, and shows no disposition to do now. He cannot keep the land and refuse to pay for it; whether the title be good or bad. If it is bad he must elect to take it as it is, or as the associates can make it, and pay for it, or else to give it up and account for the rents and profits. As he does not elect to do the last, he must pay for the land. The prayer of his complaint is not that the contract may be rescinded, but that the trustees may account for the proceeds of sales made by them, and may be decreed to convey the lands to him by a good and sufficient title, and to relieve it from incumbrances or outstanding claims, and repay to him the amount paid by him, &c.; and that the trustees be removed and new trustees be appointed, &c.
The plaintiff objects that the agreement with him was signed not by the board of directors, but by Delafield whom they had appointed their agent, and that they had no power to appoint an agent with power to contract to sell. If this be so, and the plaintiff is not bound by the contract, then he can come into court only on the ground that neither he nor the company *519 is hound by the contract. In that case he is still bound to pay his notes, unless he offers and is willing to give up the lands and to account for the rents and profits. This he shows no inclination to do. His prayer is not to rescind the contract, but for a specific performance of it. He thus adopts it as a valid contract, and the company do’the same, by recognizing the acts of Delafield, and insisting oh the plaintiff’s performance of it; by accepting the payment of some of the installments, and using and appropriating as their own the notes given by the plaintiff for the residue of the purchase money. Under the power in the directors “ to appoint a secretary and such surveyors and other assistants as might be necessary” they could appoint an agent who should sign contracts, on such terms as should be previously authorized by them. It is to be presumed this was done in this case.'
The plaintiff also claims that he is entitled to an account of the general proceeds of sales. This has been given in general terms, in the evidence at special ternr; it being shown that such accounts have been rendered periodically, and that the expenses and payments exceeded the amounts received. Generally, the question whether a good title can be made is to be passed upon before a referee, and so also is an account to be taken before him. But the parties may, if they choose, and the court consent, have the same matters inquired into by the court. This course was adopted in this case.
The plaintiff had been sued upon some of the notes given for the installments yet unpaid. Costs were incurred in those suits, and they were stayed by injunction in this action. The merits of the defense in those suits were necessarily gone into, on the trial of this action, and were found'against the defendant. This court was bound to decide on what terms the plaintiff was entitled to the specific performance for which he asked. Certainly he was to pay the notes, and interest thereon, and also the costs unnecessarily caused by him in those actions, before he could he entitled to a deed. These are the terms imposed by the special term, with this addition only, that it is made imperative on the plaintiff to pay those notes, as it is also on the trustees to convey the lands to him by a *520 good and. sufficient deed of conveyance. This affirmative relief it was in the power of the court to grant to the defendants. It was also proper that the plaintiff should pay the costs, as he failed in showing any fault in the company.
With the views before stated, it is not necessary to notice the claim of Mr. Berrien to hold the notes as a bona fide purchaser. He received them, as he says, before maturity, in satisfaction of a debt previously due to him by'the associates, for counsel fees. His counsel insists that the rule in Coddington v. Bay, (20 John. 637,) and in Stalker v. McDonald, (6 Hill, 96,) only applies -where a note is taken as collateral security for an antecedent debt, and riot where it is taken in payment, or satisfaction, of such debt. Such was not the opinion of the chancellor, in the last case. (See particularly, 6 Hill, 102.) The reason of the rule applies equally to each case. It is that the receiver of the note is to be protected only when he has lost his property or security by reliance on the note, without notice of any defense of the maker, to it. As soon as it should be ascertained that such defense existed, the receiver of the note would be restored to his original cause of action against his debtor, and so would sustain no loss, beyond that which would result from delay; for which the maker of the note should not be accountable. Youngs v. Lee, (2 Kern. 551,) professed to be in accordance with those cases. It did not intend to overrule them, or to give a new interpretation of them, and therefore, if not in accordance with them, is an accidental omission to apply the principles of those cases, but not a reversal of them. But in this case, if the title to the lands should fail, it does not appear but that the plaintiff has received a full equivalent for the notes given by" him, in the use and enjoyment of the lands, the possession of which he still retains. He cannot, therefore, resist the payment of the notes.
The parties have chosen (probably because they relied on certain points of law as clearly in their favor,) to leave several matters of fact in comparative obscurity which might be easily cleared up. Among these, is the law of Florida as to, trusts, and as to the words necessary to create an estate in fee ; and *521 whether the common law or the civil law prevailed there, at the time of these conveyances; also whether the actual recovery in the ejectment suit was of these or of other lands only; and if so. whether by the law of Florida the recovery is limited to lands of which the tenant to whom the notice is given is in possession, or includes all lands described in the action. The court has decided on the evidence before it. It may still be expedient for the parties to ascertain the precise facts in all those respects, and to insert them in the case.
[New York General Term,
February 12, 1857.
The attention of the plaintiff is drawn to the fact that he has made no formal case: that he has not excepted to the finding of the special term, and has not procured there any finding of the facts and the law.
The judgment of the special term should be affirmed, with costs.
Mitchell, Roosevelt and Davies, Justices.]